WILLIAM L. OSTERHOUDT (SBN 043021)
DOLORES OSTERHOUDT (SBN 215537)
Law Offices of William L. Osterhoudt
135 Belvedere Street
San Francisco, CA 94117
Tel: (415) 664-4600
Fax: (415) 664-4691
Email: Osterhoudt@aol.com


FRANK S. MOORE (SBN 158029)
Law Office of Frank S. Moore
1374 Pacific Avenue
San Francisco, CA  94109
Tel: (415) 292-6091
Fax: (415) 292-6694
Email: fsmoore@pacbell.net

Attorneys for Defendant,
MEHRDAD HAKIMIAN


## UNITED STATES DISTRICT COURT,

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. **CR-09-00021 DLJ** |
| Plaintiff, | |
| v. | **DEFENDANT MEHRDAD HAKIMIAN'S SENTENCING MEMORANDUM** |
| MEHRDAD HAKIMIAN, et al., | |
| Defendants. | Date:  July 2, 2010 |
| | Time:  10:00 am |
| | Place: Honorable D. Lowell Jensen |

## INTRODUCTION

On July 2, 2010, Defendant Mehrdad Hakimian is scheduled to come before this Court for sentencing.  We have received a final pre-sentence report and by the foregoing respond to the specific sentencing recommendations contained therein. Additionally, we will discuss the defendant's personal history and the very

significant positive impact that Mr. Hakimian has had on friends, family, employees and the community at large, as shown by the voluminous letters of support submitted to this Court on his behalf. Finally, we will address an alternative sentencing proposal that would allow Mr. Hakimian to contribute to the community in a very positive and valuable way, benefiting a large and underserved group of persons ("aged out" foster children) who are at risk and in need of the kind of support he can provide.

## DISCUSSION

On February 5, 2010, Mr. Hakimian pled guilty to ten immigration-related offenses: two counts of harboring illegal aliens (Counts Eleven and Twelve), one count of conspiracy to commit visa fraud (Count Fourteen) and seven counts of visa fraud (Counts Fifteen through Nineteen, Twenty-Two and Twenty-Three).  After a jury trial, on March 18, 2010 Defendant Hakimian was convicted of the remaining eleven counts of the Superseding Indictment, alleging wire fraud and conspiracy to commit wire fraud (Counts One through Ten) and obstruction of justice (Count Thirteen).

As this Court is aware, the allegations of wire fraud which are at the heart of his case concern the billing of insurance companies for different (more expensive) windshield glass than that which was actually installed in the vehicles.   The allegations of harboring concern the hiring and protection of immigrant workers who

lacked proper work authorization, shielding them from detection, and the visa fraud charges involved signing and submitting immigrant visa petitions which contained inaccurate work descriptions and salaries for the workers involved.   Defendant Hakimian has no criminal history -- has never previously been arrested for, or convicted of, a criminal offense.

## I.  Mehrdad Hakimian

We have attached to this memorandum a large number of letters written to the Court by persons wishing to support Mr. Hakimian.  These earnest submissions to the Court come from people in all walks of life.  They are from family, friends, business associates and employees (Attached as Exhibits D, E and F respectively). Some are from people to whom Mr. Hakimian has offered some kindness, large or small, that they have remembered and for which they are grateful and appreciative. It is obvious that Tony Hakimian has touched many lives, and that his positive, mentoring influence is widespread.   Mr. Hakimian is an extraordinary person who has given of himself enormously to help others less fortunate, whether their misfortune stems from grief for the loss of a loved one, from illness or injury, financial challenges, or errors in judgment.  He is kind, thoughtful and forgiving and these qualities shine through the letters we have submitted for the Court's consideration.

Mr. Hakimian is also a complex person who has placed great value on hard work and success.  Born and raised in Tehran, Iran, Mr. Hakimian's family arranged for him to come to the United States when he was a teenager (16 years old), so that he could be educated here. While in high school, Mr. Hakimian worked two jobs at night in order to support himself.  After completing high school, he received a Bachelors Degree from the University of San Francisco, and later attended graduate school at San Francisco State University.  Mr. Hakimian became a naturalized United States citizen in 1992.

While in college Mr. Hakimian worked at an auto glass facility in order to support himself.  In this setting he learned the trade that has remained his career ever since.  In 1989 he opened his first auto-glass repair and replacement shop, and over the next twenty years, his business grew to eventually comprise of over 60 shops throughout the country, employing 700 persons.  Mr. Hakimian took great pride in his business, maintaining a rigorous travel schedule, opening new shops, advertising for and hiring new workers to man those shops, and setting up the physical premises for them.  Some of the persons who have written on his behalf attest to the personal labor he invested in these shops.  He has also taken an enormous personal interest in the well being of his employees, many of whom have written to the Court.  Some of the incidents they recount are truly inspiring.  Frank McDermott, a Regional Manager of Glass Emporium, writes about a store manager in Jacksonville who

found she was suffering from cancer.  Mr. Hakimian, who had never met the manager immediately sent her a $3000 check to assist in personal expenses and kept track of her condition thereafter.  When she sadly passed away, Mr. Hakimian paid her funeral expenses because her husband did not have sufficient funds.  To Mr. McDermott, Tony Hakimian is a "great man" who consistently thinks of other people's welfare.  Another employee, Joseph Dills, has always found Mr. Hakimian to be "kindhearted, helpful and compassionate," going out of his way to help persons who fall ill and encouraging people experiencing life challenges.   Robert Kimble writes the Court of an occasion when he lost a deposit of roughly $2000.  When he confessed this to Mr. Hakimian, Mr. Hakimian's reaction was to reassure him "Bob, mistakes happen.  Don't worry about it."   And Rahel Alemayo reflects: "Tony Hakimian believed in me and gave me a position as a manager, ever since then I truly started to believe in myself in more of a positive way." These experiences, recounted in letters submitted to the Court, are seemingly endless.  They explain why one of the Defendant's great concerns at the present juncture is the fate of his employees if he is unable to remain at the helm of his company.

In 2006, Mr. Hakimian married his wife, Katherine (Katy), and in 2009, his twin sons, Kian and Kasra, were born. Mehrdad and Katy Hakimian have an extremely warm and supportive relationship as evidenced by her letter to the Court. As a Deputy Public Defender in San Francisco practicing for over twelve years,

Katy has experienced Tony's great compassion and concern for disadvantaged people. She writes:

> "So I guess you could say the first thing I fell in love with was Mehrdad's heart – his compassion and respect for all people is boundless. Friends and strangers alike have been touched by Mehrdad's kindhearted nature. And his touch, whether it is transmitted through sound advice, financial assistance, or emotional support, is remembered for a lifetime. Believe it or not, the receptionist at every doctor's office, business or even hair salon knows his voice when he calls and will go out of their way to return the kindness and respect he has bestowed on them. Put simply, Mehrdad's heart impacts people's lives every single day."

The devotion of Katy and Tony to their young sons has affected everyone who knows them. One of the most painful aspects of the case for many of these letter-writers is the possibility that Kian and Kasra could be deprived of their father's company for a significant period of time during their early, formative years. As the probation report reflects, Kian suffers from a condition called microcystic lymphatic malformation, which will require at least one surgery near his eye, and repeated injections of Bleoycin, a toxic agent normally used to treat cancer patients suffering from Lymphoma and Hodgkins, and only used by one hospital in the United States, Children's Hospital Boston.

Warm and insightful letters from Tony Hakimian's father, mother, sister, niece, in-laws, and many, many people who simply *consider* Tony a father, uncle or brother because of the familial care and guidance he has always shown them underscore Katy Hakimian's reflections about her husband's true character. They

speak of the commitment that Mehrdad has made to really get to know friends and family, and to be physically and emotionally present to celebrate their successes and mourn their losses.   Masoud Mosharraf, for example, refers to Mehrdad as his "human angel" because of the kindness shown during a particularly difficult moment in his life, the loss of his father.  Reduced down to their essence, these letters, unique and detailed, eloquently explain that Tony Hakimian has deeply touched the lives of those around him in positive ways, and inspired the writers to be better people.  We emphasize these qualities here because in Counsel's experience, they are rare and special.

Nor would it be accurate to say that, while Mr. Hakimian is exemplary in his personal behavior, his company is permeated by fraud.  If the trial demonstrated anything about Glass Emporium, it demonstrated that there was no systematic, company-wide fraud against insurance companies.  During trial no fewer than fifteen present and past employees testified that Mr. Hakimian never told them to over-bill insurance companies for work preformed at local shops they managed or at which they installed glass.  I refer to Kathy James, Omerlee Harris, Joel McDaniel, Emily Ellison, Nicole Coley, Shannon Tuck, Keith Elder, John Ketchum, William Basil Sands, Avis DeWalt, Michelle (Crane) Walton, Mike Happney, Arezou Bidgoli, Delmar Cook and Judy Plummer.  These were credible witnesses and their testimony showed quite clearly that there was no company-wide directive to defraud insurance

companies.  These people and others testified that Mr. Hakimian appeared to run an honest business and that he expected honesty from his employees.

To say this is not intended to impugn the jury's verdict which of course we fully respect, but rather to emphasize that the fraudulent conduct found to exist was much less widespread than suggested by the government.  In a chaotic industry where prices are set arbitrarily and bear little relation to the market, and operating in a harried and competitive environment, the vast majority of Glass Emporium employees acted ethically and responsibly.  This would not be true if Mr. Hakimian had directed a fraudulent scheme which instead of being limited to the cases shown in the evidence permeated the entire company.

The employees, past and present, who wrote to the Court underscore this point.  John Ketchum writes of Mr. Hakimian that "[h]e has taught me to run my store, my district, and my life with the highest integrity."  Arezou Bidgoli praises Mehrdad as "an honest, generous and down to earth person" who "encourages all of his employees to reach their highest potential regardless of the job they currently hold."  According to Lea Kearney "Tony has always stressed the importance of honesty and making sure we are not charging for parts not used since I was here."  Michael Happney, to whom Mr. Hakimian devoted extensive attention when Happney suffered a heart attack in 2008, writes that Mehrdad has earned his "loyalty, respect and admiration" by the way he has run his business.  These and

other employees obviously regard the defendant with great affection, but they also regard him as an employer who, according to their observation, attempts to conduct the company's business in an honest way.

Outside of the sphere of his employment, Mr. Hakimian has long been concerned with the welfare of the community, particularly sick and homeless people. Thus, his interest in the vulnerable population we have characterized as "aged out" foster children, which gives rise to the alternative sentencing proposal we present herein, is not out of character. Notably, Mehrdad's brother-in-law, Khaleel Isa, has written the Court that he is a clinical psychologist currently working with foster children and adolescents in Alameda County. His experience with this population, which he likens to "domestic refugees because of their displaced status without a home or parent" has not been lost on Mehrdad, who, as he emphasizes "is a man known by many as a community leader."

## II.    Repayments to Insurance Companies:

As noted in the pre-sentence report at paragraph 34, Defendant Hakimian has made substantial repayments to insurance companies affected by the offense conduct in this case. He did this prior to trial. As counsel for the defendant, we can assure the Court that Mr. Hakimian wanted to make these repayments since he was initially charged by way of complaint several years ago. Only the caution of his attorneys, who were insistent on viewing the evidence and obtaining discovery, dissuaded the

defendant from making these refunds earlier.  He wanted to do this because he was satisfied that his company received monies from insurance companies to which it was not entitled.   And he wanted to make it good regardless of whether the overpayments were the result of actual fraud or of simple error, or who was responsible.   In this sense, Mr. Hakimian has always wanted to take financial responsibility.

In addition to these repayments, Mr. Hakimian repaid $112,789 to State Farm, Insurance Company in 2006 in the context of a civil monetary settlement in which he paid a total of $1.25 million to State Farm.  The latter figure does not reflect actual overpayments found to exist but is rather the product of various statutory multipliers in insurance fraud cases that supported a settlement well in excess of actual overpayments.  We have attached hereto as Exhibit "B" the schedule of Mr. Hakimian's repayments in 2009.  We respectfully urge the Court that this conduct is worthy of strong consideration in arriving at a fair and equitable sentence in this case.

## III.   The Pre-Sentence Report:

The Defendant appreciates the care and attention that was put into the preparation of the pre-sentence report.  There are, however, certain findings of the Report that we strongly believe are erroneous, chief among them the loss calculation driving the wire fraud sentencing analysis, which we will address herein.

***Paragraph 24 (pages 9-10)***:  In Paragraph 24, the Report discusses the loss calculation attributable to the defendant's offenses.  Noting that the figure is speculative, the Report goes on to accept the loss amount proffered by the government of $2,070,432.49, stating that this amount was "corroborated by trial testimony."  This is not correct.  As fully set forth in the Loss Calculation Report authored by Frank S. Moore (attached hereto as Exhibit "A"), the government has failed to substantiate its claimed loss amount even by a preponderance of the evidence.[1]  According to the evidence adduced at trial, the actual loss attributable to fraudulent conduct is far less than the 2 million dollars used as the starting point of this analysis in the pre-sentence report, and should be corrected by the Court.

***Paragraph 32 (page 12)***:  In Paragraph 32, the Report discusses the circumstances underlying the visa fraud counts of the Superseding Indictment.  This paragraph overstates the defendant's role in the preparation and submission of the immigrant visa applications at issue.  Paragraph 32 states: "As the owner and sponsor of the majority of the fraudulent visa petitions submitted on behalf of prospective employees seeking H-1B petitions, Hakimian was the leader and organizer of the visa fraud.  In addition, Hakimian coordinated the submission of

---

[1]  As discussed by Mr. Moore, where as here, the government's loss calculations have the effect of an extremely disproportionate sentence, the claimed loss must be scrutinized under a "clear and convincing" standard of proof.  The government's loss calculations cannot survive such an analysis.

applications with employees from Joblink, and further allowed the applicants to begin working prior to their approval, and began paying them through Joblink to avoid documentation of their illegal employment."

Mr. Hakimian pled guilty to these Counts prior to trial based on his understanding that he is criminally liable for signing visa petitions for immigrant employees which contained materially false statements regarding salary and job description.  The defendant was not the instigator of these petitions.  Initially, various company officers (not Mr. Hakimian) were contacted by Joblink, which maintained that it was an employment service in the business of placing immigrant workers in positions of employment. Other employees brought the idea to Mr. Hakimian who, consistent with his background, was receptive to hiring immigrant workers to assist them and to provide needed services for the company.  Thereafter Joblink prepared false and fraudulent visa applications for GEMI workers, whom Joblink charged for this assistance.  The fraudulent petitions were prepared by Joblink employees and attorneys who had no connection to Mr. Hakimian.  He was presented with the completed petitions with signature lines for him.  He signed the petitions and, as he came to realize that the information in them was not correct, was therefore liable and accordingly pled guilty.  But it is not accurate to refer to the Defendant's conduct as exhibiting leadership under these circumstances.  He was presented with workers, signed their petitions, and paid them for their work.  There

was no demonstrative planning, organization, or direction offered by Defendant with respect to these petitions.  Thus this enhancement is inappropriate.

**Paragraph 50 (page 15)**:  In Paragraph 50, the Report applies a two-level enhancement for obstruction of justice pursuant to USSG §3C1.1.  Mr. Hakimian was convicted of obstructing justice in violation of 18 USC §1512(c)(1) (Count Thirteen).  Because under the Guidelines, 18 USC §1512(c)(1) is properly referenced to USSG §2J1.2, the Report errs in applying this enhancement.  In this regard USSG §2J1.2, comment (n.2(A)) specifically directs:

> "Inapplicability of Chapter Three, Part C. – For offenses covered under this section, Chapter Three, Part C (Obstruction) does not apply, unless the defendant obstructed the investigation, prosecution, or sentencing of the obstruction of justice count."

See also USSG §3C1.1, comment (n.7).  Mr. Hakimian was convicted of obstructing the underlying offense investigation, which resulted in Count Thirteen.  He was not convicted, nor was he ever accused, of obstructing the investigation or prosecution of Count Thirteen.  Consequently, Count Thirteen should have been calculated pursuant to USSG §2J1.2 and should comprise an entirely separate Group, under the Multiple Count rules at USSG §3D1.4. This two-level increase is thus inappropriate.

**Paragraphs 54 and 62 (pages 15 and 16)**:  Under USSG §2L1.1(b)(1), if the immigration-related offenses were committed "other than for profit" the base offense level is decreased by three levels, from 12 to 9.  In Paragraphs 54 and 62, the Report finds that this decrease of 3 levels is not appropriate in this case, because Mr.

Hakimian, as an employer, would benefit financially from the labor of this workforce.   In so finding, the Report misapprehends the meaning of this provision.

The Application notes to Section 2L1.1 explain that "committed other than for profit" means "that there was no payment or expectation of payment for the smuggling, transporting, or harboring of any of the unlawful aliens."   Mr. Hakimian's conduct fits within the description of "other than for profit" as he had no expectation of payment and received no payment from the immigrant employees who he sponsored, or from anyone else.  In fact, Mr. Hakimian spent money helping these workers petition for their visas in addition to compensating them for their services at the same rate that GEMI's U.S. citizen employees were paid.  Thus, his unlawful conduct was "other than for profit."

The case law supports this interpretation. In *United States v. Torres,* 81 F.3d 900 (9th Cir. 1996), for example, the Ninth Circuit held that the defendants were not eligible for the 3-point decrease of the base offense level under §2L1.1(b)(1) because immigrants paid the defendants' agency to create fraudulent immigration documents, and the defendants personally received financial compensation for illegally creating such visa petitions.  See also *United States v. Buenrosto-Torres,* 24 F.3d 1173, 1175 (9th Cir. 1994)(district court did not clearly err in finding that crime was committed "for profit" when defendant sold false immigration documents and sheer quantity of such documents in his possession showed that intended them to be for profit.)

Because there was no financial gain to the Mr. Hakimian in sponsoring the immigrant visa applications or in harboring Mr. Antonio and his wife, a three level reduction to the base offense level is appropriate on these Counts.

**Paragraph 63 (page 16)**:   We do not believe the evidence supports the number of petitions for which the pre-sentence report would hold Mr. Hakimian responsible.  He should be held responsible for the petitions involved in his guilty pleas.  Other petitions, not involved in the charges, were the subject of government efforts to expand the case beyond the charged offenses, but these efforts were not approved by the Court and these additional instances of alleged visa fraud were not actually proven by a satisfactory standard.

**Paragraph 65 (page 16)**:   In paragraph 65, the Report finds that Mr. Hakimian maintained a leadership role in connection with the visa fraud allegations. For the reasons stated above in relation to Paragraph 32, this upward adjustment is unwarranted, because Mr. Hakimian exerted no such role in connection with these offenses, but simply signed the documents presented to him by Joblink, hired the workers, and paid them for their labor.

**Paragraph 70 (page 17)**:  Paragraph 70 states that no downward adjustment is warranted for acceptance of responsibility.  We understand that Mr. Hakimian put the government to its proof with respect to the wire fraud and obstruction counts. We write here only to make clear that Defendant Hakimian has, in a number of

ways, actually accepted responsibility.  First, Defendant pled guilty to the ten counts of the Superseding Indictment alleging immigration violations prior to trial, thereby relieving the government of the obligation to prove these charges at trial.  Second, the Defendant voluntarily paid restitution to insurance companies prior to trial.  He did this because though he strongly believed he was not personally criminally liable for the overcharging of these companies, he absolutely believed he was financially responsible as the owner of GEMI to make those companies whole. In Mr. Hakimian's letter to the probation office and this Court, he clearly accepts responsibility for his actions and expresses remorse for his wrongful conduct.  (Mr. Hakimian's letter is attached hereto as Exhibit "C").  These are all factors which the Court may properly consider in determining a just sentence in this case.

## IV.   Alternative Sentencing Proposal

Attached as Exhibit "G" for the Court's consideration is a letter from retired State Senator John Burton, founder and chair of the John Burton Foundation for Children Without Homes.   Senator Burton and his staff have evaluated Mr. Hakimian to determine the appropriateness of his joining the Foundation as a volunteer and as way of making reparations to the community for his offense conduct, as an alternative to incarceration.

Recently, after the decision in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005), there has been renewed interest in the Federal criminal justice

system in alternative sentencing proposals. See, Demleitner, "Replacing Incarceration: The Need for Dramatic Change," <u>Federal Sentencing Reporter</u>, (October 2009) Vol. 22, No. 1, p.1, Hoelter, "Sentencing Alternatives - Back to the Future," <u>Federal Sentencing Reporter</u> (October 2009) Vol. 22, No. 1, p.53, and "Community Service," <u>Court and Community</u>, Office of Probation and Pretrial Services, Administrative Office of the U.S. Courts (2005). The Administrative Office report on community service indicated that community service addresses the traditional sentencing goals of punishment, reparation, restitution, and rehabilitation, goals embodied in Title 18 USC §3553(a). In particular, it identified community service as adding a punitive measure to probation, restricting offender's personal liberty, serving to make the victim whole, and can be a form of symbolic restitution when the community at large is the victim. The circumstances of Mr. Hakimian's case fit the criteria for consideration of such an alternative.

Mr. Hakimian's proposal is substantial, as he would dedicate at least two years of his life to serving the very vulnerable population which the John Burton Foundation seeks to aid. The purpose of the proposal is to provide mentor services and counseling to recently "aged out" foster children, who are entering adulthood, beginning higher education or vocational training, or are seeking employment; provide administrative and technical assistance to the John Burton Foundation for

Children Without Homes; and provide financial resources to create an emergency "resource fund" for clients.

Mr. Hakimian proposes a comprehensive alternative service proposal, in lieu of incarceration, utilizing his background, education, experience, and skills, and his financial resources, to aid young adults emerging from the foster care system in their transition to functioning as adults. The development of this program is to both aid young adults who are former foster children and provide substantial reparations to the community, as a result of Mr. Hakimian's conviction.

The John Burton Foundation for Children Without Homes (JBF) was founded by retired State Senator John Burton in 2004. The primary purposes of the JBF are to improve the lives of California's homeless children and to develop policy solutions to prevent homelessness. One of the focuses of the JBF is to develop, administer, and aid programs for emancipated foster youth, whose personal resources are limited or non-existent. In California in 2009, 5,393 youth "aged out" of the foster care system. Slightly more than half of the youth had graduated from high school, and, statistically, only 2 - 3 percent can expect to graduate from college. The low percentage of college graduates in this group is due in large part to an absence of resources on which these youth can rely. Resources as simple as clothing, food, school supplies, personal computers, and funds for housing are not available to many

of these youth and the absence of them become barriers to entering and completing school.

To address this problem, the JBF has partnered with the California State University Chancellor's Office, the University of California system, and California Community Colleges, to develop the California College Pathways program, and aids other programs such as the Guardian Scholars Program at San Francisco State University. Other programs in which the JBF is involved are at CSU East Bay, U.C. Berkeley, and City College of San Francisco. JBF also runs the Burton Scholar Backpack to Success Program, serving 1,200 students per year.

In his proposal to the Court, for a minimum of two years (to be extended with the approval of the Court), under the supervision of John Burton Foundation staff, Mr. Hakimian will personally staff, at a minimum of 20 hours per week (1,000 hours per year), a counseling and mentor services program for young adults, in the area of educational development, vocational development, business start-up, and career planning. In partnership with other programs in which JBF is involved, Mr. Hakimian will meet one-on-one with emancipated foster youth, as well as staff group meetings of emancipated foster youth to provide guidance in the above areas.

In anticipation of the lead time required to establish the direct services Mr. Hakimian will provide to emancipated foster youth, Mr. Hakimian will also work with JBF staff in administering existing programs benefiting youth, as well as aiding

in the development of systems to be used by JBF.  It is anticipated, however, that the bulk of Mr. Hakimian's time at JBF will be providing direct services to emancipated foster youth.

Mr. Hakimian will also use the resources of his company to provide internships and training for those interested youth, as indicated in Sen. Burton's letter. He will also begin the lengthy process of developing on-going housing resources, one of the most critical needs of this vulnerable population.

Further, Mr. Hakimian will donate funds to create a "resource fund" for use by John Burton Foundation staff to aid former foster youth in need of emergency funding to pursue their educational goals. The fund, administered by John Burton Foundation staff, will provide resources for former foster youth to obtain: personal computer equipment, books, educational supplies, emergency housing, clothing, and other services and items deemed essential to furthering the youths' educational goals. Mr. Hakimian will fund this "resource fund" at an initial rate of $500,000 per year.

Mr. Hakimian will provide these services in the offices of the John Burton Foundation, or other location as approved by John Burton Foundation staff. John Burton Foundation staff will provide to the United States Probation Office verification of Mr. Hakimian's volunteer hours and the yearly donation to fund the "resource fund."

Mr. Hakimian makes this proposal so that he can make reparations to the community, serve a punitive form of probation, while at the same time maintaining his company, insuring the on-going employment of his employees and providing a forum for the above mentioned internships and, importantly, continue to discharge his responsibilities to his two young sons.

Such a proposal will clearly benefit the community, enable Mr. Hakimian to meet his responsibilities in the community, honor the seriousness of his offense conduct, and be a win for society in general.

## CONCLUSION

Based on the foregoing, Defendant Hakimian respectfully prays the Court consider a sentence which would allow him to continue in his roles as a mentor, a father, and an employer, and require him to make substantial reparations to the community for his wrongful conduct.   In this regard, the alternative sentencing proposal discussed herein meets all of the goals of Section 3553(a) for the dispensation of a sentence which is adequate, but not greater than necessary, to meet the ends of justice.

Dated:  June 28, 2010                          Respectfully submitted,


 /s/ William L. Osterhoudt
WILLIAM L. OSTERHOUDT,
Attorney for Mehrdad Hakimian

# PROOF OF SERVICE

I am employed in the City and County of San Francisco, State of California. I am over the age of 18 and not a party to the within action; my business address is 135 Belvedere Street, San Francisco, California 94117.

On the date set forth below, I caused to be served the foregoing **DEFENDANT HAKIMIAN'S SENTENCING MEMORANDUM** (and Exhibits) on all interested parties in this action by causing same to be served electronically to the following:

AUSA Stephen Corrigan
AUSA Wade Rhyne
1301 Clay Street
Suite 340 S
Oakland, CA  94612

Zenia Gilg, Esq.
809 Montgomery Street
2nd Floor
San Francisco, CA  94133

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 29, 2010 in San Francisco, California.

/s/ Dolores T. Osterhoudt
Dolores T. Osterhoudt