1   JOSEPH P. RUSSONIELLO (CASBN 44332)
    United States Attorney
2
    BRIAN J. STRETCH (CASBN 163973)
3   Chief, Criminal Division

4   STEPHEN G. CORRIGAN (MASBN 100560)
    WADE M. RHYNE (CABN 216799)
5   Assistant United States Attorney

6      1301 Clay Street, Suite 340-S
       Oakland, California 94612
7      Telephone:  (510) 637-3680
       Facsimile:  (510) 637-3724
8      E-Mail:      Stephen.Corrigan@usdoj.gov
                    Wade.Rhyne@usdoj.gov
9

10  Attorneys for Plaintiff

11

12                  UNITED STATES DISTRICT COURT

13                 NORTHERN DISTRICT OF CALIFORNIA

14                       OAKLAND DIVISION

15
    UNITED STATES OF AMERICA,        )   CR 09-00021 DLJ
16                                   )
           Plaintiff,                )   UNITED STATES' SENTENCING
17                                   )   MEMORANDUM AND MOTION FOR
           V.                        )   REMAND
18                                   )
    MEHRDAD HAKIMIAN,                )   Date: July 2, 2010
19                                   )   Time: 11:00 a.m.
           Defendant.                )
20  _____)

21

22

23

24

25

26

27

28

UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR REMAND
CASE NO. CR 09-00021 DLJ

**TABLE OF CONTENTS**

I.     BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

       A.    The Guidelines Calculations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

             1.    The Loss Amount Exceeds $2 Million. . . . . . . . . . . . . . . . . . . . . . . . 2

                   a.    Trial Evidence of Loss to the Insurance Companies. . . . . . . . . . . 4

                   b.    Ford Oval Band Windshields. . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

                   c.    Heads Up Display Windshields. . . . . . . . . . . . . . . . . . . . . . . . . . 6

                   d.    Windshield "Attachment" Over-Billing. . . . . . . . . . . . . . . . . . . . 7

                   e.    Other Parts Routinely Voided and Re-Billed. . . . . . . . . . . . . . . . 7

                   f.    Additional Local Shop Over-Billing. . . . . . . . . . . . . . . . . . . . . . 7

                         1.    DW1432 ➜ DW1293. . . . . . . . . . . . . . . . . . . . . . . . . . 8

                         2.    DW1288 ➜ DW1289 . . . . . . . . . . . . . . . . . . . . . . . . . 8

                         3.    FW2230 ➜ FW2231. . . . . . . . . . . . . . . . . . . . . . . . . . 8

                         4.    DW1474 ➜ DW1509. . . . . . . . . . . . . . . . . . . . . . . . . . 9

                   g.    High Modulus Urethane Over-Billings. . . . . . . . . . . . . . . . . . . . 9

                   h.    Installation Molding Over-Billing. . . . . . . . . . . . . . . . . . . . . . . . 9

                   i.    Loss Amount Summary Chart. . . . . . . . . . . . . . . . . . . . . . . . . . 10

             2.    More than 50 victims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

             3.    Role in the Offense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

             4.    Obstruction of Justice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

             5.    No Acceptance of Responsibility. . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

       C.    18 U.S.C. § 3553 factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

             1. Nature and Circumstances of the Offenses. . . . . . . . . . . . . . . . . . . . . 14

             2. Respect for the Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

             3. Deterrence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

III.   GOVERNMENT'S RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

IV.    MOTION FOR REMAND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

1

**TABLE OF AUTHORITIES**

2

**FEDERAL CASES**

3   United States v. Ameline, 409 F.3d 1073 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

4   United States v. Cantrell, 433 F.3d 1269 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

5   United States v. Howard, 894 F.2d 1085 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

6   United States v. Rettenberger, 344 F.3d 702 (7th Cir.2003). . . . . . . . . . . . . . . . . . . . . . . . . . . 3

7   United States v. Showalter, 569 F.3d 1150 (9th Cir. 2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

8   United States v. Staten, 466 F.3d 708 (9th Cir.2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

9   United States v. Swanson, 360 F.3d 1155 (10th Cir.2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

10   United States v. Zolp, 479 F.3d 715 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

11

**FEDERAL STATUTES**

12   18 U.S.C. § 1343. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

13   18 U.S.C. § 1952. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

14   18 U.S.C. §3143(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

15   18 U.S.C. § 3553. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 14

16   18 U.S.C. § 3553(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

17   18 U.S.C. § 3553(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 14

18   18 U.S.C. § 3553(a)(1).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

19   18 U.S.C. § 371. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

20   18 U.S.C. § 3143(b)(A) and (B)(i)(ii)(iii) and (iv). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

21   Federal Rule of Criminal Procedure 32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

22   Criminal Local Rule 32-5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

23

24

25

26

27

28

UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR REMAND
CASE NO. CR 09-00021 DLJ                    ii

1        Pursuant to Federal Rule of Criminal Pursuant to Federal Rule of Criminal Procedure 32

2   and Criminal Local Rule 32-5, the United States respectfully submits this Sentencing

3   Memorandum.

4        The government concurs with the guidelines calculations contained in the presentence

5   investigative report (PSR).  Applying the relevant sentencing guidelines to this case, the United

6   States Probation Officer (USPO) calculates that the correct offense level is 33, resulting in a

7   sentencing range of 135 to 168 months.  Based upon the Sentencing Guidelines calculations and

8   the 18 U.S.C. § 3553 factors, the government recommends a sentence of 135 months

9   imprisonment, 3 years supervised release, the payment of a fine of $175,000, and the payment of

10  $2,100 in special assessments.

11  **I.      BACKGROUND**

12       Defendant Merhdad Hakimian was initially charged by criminal complaint filed on

13  October 31, 2007, along with co-defendants Emma DeGuzman, Aldy Antonio, and Bobby

14  Guinto with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371 and wire fraud, in

15  violation of 18 U.S.C. § 1343.  On May 23, 2008, the four defendants were charged with the

16  same two counts by information.  On January 2009, Defendants Hakimian and DeGuzman were

17  charged in a twelve count indictment with conspiracy to commit wire fraud, nine counts of wire

18  fraud, and two counts of harboring illegal aliens.  Defendants Antonio and Guinto have entered

19  guilty pleas to wire fraud offenses and are scheduled to be sentenced after the sentencing of

20  defendant Hakimian.

21       On January 14, 2010, a twenty-four count superseding indictment was filed.  In addition

22  to the original twelve counts, defendant Hakimian and DeGuzman were jointly charged with

23  obstruction of justice, conspiracy to commit visa fraud, and one count of visa fraud.  Defendant

24  DeGuzman was charged separately in two counts of visa fraud.  Defendant Hakimian was

25  charged separately in seven counts of visa fraud.  Defendant DeGuzman entered guilty pleas to

26  the conspiracy to commit visa fraud and harboring an illegal alien and is scheduled to be

27  sentenced on July 9, 2010.

28

UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR REMAND
CASE NO. CR 09-00021 DLJ          i

On February 5, 2010, Defendant Hakimian entered guilty pleas, without a plea agreement, to the conspiracy to commit visa fraud, and seven of the eight visa fraud counts. The government dismissed the remaining visa fraud count prior to trial. Trial on the remaining counts began on February 23, 2010. On March 18, 2010, the defendant was found guilty by the jury of all counts. Sentencing is scheduled for July 2, 2010 at 10:00 a.m.

## II.   DISCUSSION

### A.   The Guidelines Calculations

The USPO correctly calculated the wire fraud guidelines calculations as follows:

Group One

| | | |
|---|---|---|
| Base offense level, U.S.S.G. §2B1.1(a)(1) | 7 | |
| Loss greater than $1,000,000, U.S.S.G. §2B1.1(b)(1)(I) | +16 | |
| More than 50 victims, U.S.S.G. § 2B1.1(b)(2)(B) | +4 | |
| Role in the offense, U.S.S.G. §3B1.1(a) | +4 | |
| Obstruction of justice, U.S.S.G. §3C1.1 | +2 | |
| Resulting offense level | 33. | PSR at ¶¶ 45-51. [1] |

#### 1.   The Loss Amount Exceeds $2 Million

The United States and the USPO agree that the loss amount is $2,070,432.49, resulting in a 16-level increase in the offense level pursuant to U.S.S.G. § 2B1.1(b)(1)(I). The Defendant disagrees with that calculation, but does concede that the loss amount is not less than $277,160.80, which would result in not less than a 12-level increase in the offense level. (See PSR, ¶ 26.) Accordingly, the starting point for the Court's loss analysis is a loss amount of $277,160.80. However, as explained below, the loss amount is much larger.

---

[1] The government agrees with the Guidelines calculations for Group Two, Harboring illegal aliens, and Group Three, Visa fraud offenses, with one exception. Due to the defendant's guilty pleas to these offenses, we believe a reduction for acceptance of responsibility would apply. Since the Guidelines calculation for Groups Two and Three do not impact the higher Guidelines calculations of Group One, and because the defendant raised no objections to these calculations contained in the draft PSR, the government will not further address the factual basis for the calculations contained in the Amended PSR.

1         The starting point for the Court's loss analysis is Section 2B1.1.  See United States v.

2    Cantrell, 433 F.3d 1269, 1280 (9th Cir. 2006) (the consultation requirement of 18 U.S.C. §

3    3553(a) "obliges the district court to calculate correctly the sentencing range prescribed by the

4    Guidelines").  For purposes of determining the offense level, the loss amount is the greater of

5    actual loss or intended loss.  U.S.S.G. § 2B1.1, cmt. n. 3(A).  In determining loss, section

6    2B1.1(b)(1) directs the Court to make "a reasonable estimate."  U.S.S.G. § 2B 1.1, comment.

7    (n.3(C)).  The court's estimate of monetary loss can be based on "[t]he approximate number of

8    victims multiplied by the average loss to each victim" or "[m]ore general factors, such as the

9    scope and duration of the offense and revenues generated by similar operations."  United States

10   v. Showalter, 569 F.3d 1150, 1161 (9th Cir. 2009) (citing U.S.S.G. § 2B1.1, cmt. n. 3(C)(iii) &

11   (v)).  Thus, a district court has a number of permissible methods for determining monetary loss,

12   and "need not make its loss calculation with absolute precision."  United States v. Zolp, 479 F.3d

13   715, 719 (9th Cir. 2007).

14        A defendant is responsible for all reasonably foreseeable acts or omissions of others in

15   furtherance of jointly undertaken criminal activity that occurred during the commission of the

16   offense of conviction, in preparation for the offense, or in the course of attempting to avoid

17   detection or responsibility for the offense.  U.S.S.G. § 1B1.3.  Thus, in addition to his own

18   conduct, the defendant is responsible for all of the potential loss caused by his co-conspirators in

19   this matter.

20        A defendant's repayment of money does not reduce the loss amount for sentencing unless

21   the defendant returned the money before the offense was detected.  See U.S.S.G. § 2B1.1, cmt. n.

22   3(E)(i); see also e.g., United States v. Rettenberger, 344 F.3d 702, 708-09 (7th Cir.2003)

23   (calculating intended loss based on entire fraudulent scheme had it continued rather than the loss

24   suffered by the date of the scheme's discovery); see also United States v. Swanson, 360 F.3d

25   1155, 1169 (10th Cir.2004) (holding that unlike repayment of loss before the crime is detected,

26   repayment of loss after the crime is detected does not discount loss calculation for sentencing

27   purposes).  The time of detection of the offense is the earlier of: (1) the time the offense was

28   discovered by a victim or government agency; or (2) the time the defendant knew or reasonable

UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR REMAND
CASE NO. CR 09-00021 DLJ       3

should have known that the offense was detected or about to be detected by a victim or government agency.  See Id.  Accordingly, none of defendant's pre-trial payments to the insurance companies will result in a decreased to the loss amount for purposes of sentencing.

"[T]he party bearing the burden of proof will be required to meet a 'preponderance of the evidence' standard" on sentencing guideline issues.  United States v. Howard, 894 F.2d 1085, 1090 (9th Cir. 1990); see also United States v. Ameline, 409 F.3d 1073, 1086 (9th Cir. 2005).  But, "where an extremely disproportionate sentence results from the application of an enhancement, the government may have to satisfy a 'clear and convincing' standard." United States v. Staten, 466 F.3d 708, 717 (9th Cir.2006) (internal citations omitted).  Here, the United States does not contest that, under Staten, a clear and convincing standard applies here to the loss calculations and number of victims.  In any event, the United States has met its evidentiary burden under either standard.

### a.    Trial Evidence of Loss to the Insurance Companies

The trial evidence proved that the defendant's insurance fraud occurred at both the Glass Emporium corporate office (by voiding, inflating, and then re-billing insurance invoices) and at various local shops (by inflating and then billing insurance invoices).  The resulting payments from insurance companies constituted approximately 20% of the defendant's business revenue.  Although the date range for the charged conspiracy was 1999 through December 2006, the billing data for purposes of calculating loss was not available until the end of 2002, which is when the Dialmark computer invoicing system came on-line at Glass Emporium.  For that reason, the United States' loss calculations are conservative because they do not account for fraud committed during the years 1999 through 2002, which would constitute nearly half of the conspiracy's time frame.

As the trial evidence proved, the Dialmark computer invoicing system – which was seized from the Glass Emporium corporate office during the execution of the December 2006 search warrant – maintained detailed data of Glass Emporium's billing activities.  The Dialmark system allowed certain Glass Emporium employees, at the corporate level, to change the billing invoices, by substituting more expensive windshield part numbers and installation materials,

UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR REMAND
CASE NO. CR 09-00021 DLJ          4

prior to submitting them to insurance companies.  In order to do so, corporate employees were required to log on using a personalized user I.D. and password, "void" the original local store invoice, and create a new invoice with a new invoice number.  Each void left an "electronic footprint" on the Dialmark system showing which user made the change and what change the user made.

By comparison, fraud committed at the local store level required no void or change to void the original invoice because the invoice was inflated prior to its arrival at the corporate office.  Because the local store fraud did not necessitate a void, there was no "electronic footprint" on the Dialmark system, and no record of the inflated invoice as would occur when the invoices were voided at headquarters.  However, various Glass Emporium's managers and employees testified that they routinely inflated invoices at the store level as directed by the defendant, Antonio, and others.  As Accounts Receivable Manager, Aldy Antonio testified he was told by the defendant to direct others to inflate invoices to be submitted to insurance companies and when questioned, regularly told Glass Emporium's managers, "this is how the boss [Hakimian] wants it done."

An analysis of Glass Emporium's invoicing data, beginning in 2003, establishes a pattern of wide-spread insurance fraud at the corporate level.   Moreover, these overbillings cannot be attributed to employee error because, as the trial evidence conclusively showed, Glass Emporium was voiding invoices at a much higher rate than other glass companies.  The statistically significant number of voids was consistent with the trial testimony that the defendant gave instructions to ceratin employees commit fraud, and some of the employees followed the defendant's instructions.  (See Trial Exhibit 11a-d)

**b.      Ford Oval Band Windshields**

As presented at trial, Carlite is the exclusive distributor of the rare, "Ford Oval Band" ("FOB") windshields, including the following seven part numbers: DW1332, DW1335, DW1337, DW1356, DW1359, DW1361, and DW1365.  With respect to part numbers DW1332 and DW1335, Glass Emporium billed for far more parts than were ever distributed (See Trial Exhibit 11a-11d.)  In addition, the defendant acknowledged at trial that Glass Emporium never

1   purchased any DW1332s or DW1335s.  These expensive windshields make up the bulk of the

2   FOBs (950 of 1,156) that employees fraudulently billed to insurance companies.

3        The analysis of the Dialmark billing data reveals the following:  Between December 28,

4   2003 and May 1, 2006, there were 619 invoices voided at the <u>corporate office</u> and re-billed as

5   FOBs.  Based upon an average price difference of $320.29, the total fraud amount is $198,261.78

6   .  Between October 24, 2002 and May 1, 2006, there were 537 FOB invoices that originated at

7   the <u>local shops</u> and were ultimately billed to insurance companies.  Based upon an average price

8   difference of $320.29, the total fraud amount is $171,995.73..  Therefore, in all, between October

9   24, 2002 and May 1, 2006, there were a total of 1,156 FOBs billed to insurance companies for a

10  total fraud amount of <u>$370,257.51</u>.

11       An analysis limited to the DW1332 and DW1335 billing data reveals that 567 invoices

12  were voided and re-billed as FOBs at the corporate office for a total price difference of

13  $195,653.74 while 383 invoices originated at the local shops for a total price difference of

14  $132,146.49 (based upon an average price difference of $345.03).  Thus, Glass Emporium billed

15  for a total of <u>950</u> DW1332s and DW1335s for a total fraud amount of <u>$327,800.23</u>.

16                          c.        **Heads Up Display Windshields**

17       At trial, representatives from State Farm Insurance ("SFI") testified about their audit of

18  Glass Emporium insurance claims in which a sampling of approximately 406 vehicles were

19  visually inspected and approximately 326 vehicles were confirmed to be cases of insurance over-

20  billing.  In their initial audit, SFI targeted several part types, including FOBs and HUDs, that

21  were susceptible to fraud based on high-priced interchangeable part numbers.  SFI found that in

22  many instances, SFI was billed for a HUD even though the vehicle was not HUD-equipped.

23       An analysis of the billing data proved that between December 26, 2002 and October 11,

24  2006, 88 invoices were voided at the corporate office and re-billed as HUDs.  Based upon an

25  average price difference of $255.06, the total fraud amount is $22,445.14.  In addition, between

26  November 6, 2002 and December 16, 2006, 1,036 HUD invoices originated at the local shops

27  and were ultimately billed to insurance companies.  Based upon an average price difference of

28  $255.06, the total amount of the fraud is $264,242.16.  Therefore, in all, between November 6,

UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR REMAND
CASE NO. CR 09-00021 DLJ              6

2002 and December 16, 2006, there were a total of 1,124 HUDs billed to insurance companies for a total fraud amount of $286,687.30.

### d.    Windshield "Attachment" Over-Billing

Mr. Duane Rogowski, the Director of Research and Development at Digital Business Controls, testified that many windshields come with attachments (e.g. moldings, rain sensors, clips, etc.) already included in the price of the windshield part.  In billing those windshields, Antonio testified that many of these windshield types were billed correctly by the local shops. However, once received by the corporate office, many of these invoices were voided and then re-billed, thereby adding an additional fraudulent charge for attachments that were already included in the original prices of the windshields.

An analysis of the billing data for the windshield attachments reveals that a total of 919 invoices were received by the corporate office, voided, and re-billed to reflect that the windshield did not already come with an attachment.  It should be noted that 216 of the 919 resulted in a negative or total price decrease.  The total fraud amount for the attachment void and re-bills is $39,482.71.

### e.    Other Parts Routinely Voided and Re-Billed

Using the Dialmark billing data from Rogowski, the United States was able to isolate other suspected fraudulent claims that were voided at the corporate office and then re-billed to an insurance company using a substituted, more expensive part.  An analysis of the Dialmark data revealed that between June 26, 2001 and December 14, 2006, 2,992 invoices were received from the local shops, then voided at the corporate office, and then re-billed to an insurance company with a higher-priced substitute part.  The 2,992 invoices does not include the above-referenced FOBs and HUDs.  Nevertheless, the 2,992 invoices that were voided and then re-billed with a higher-priced substitute part resulting in a total price difference of $243,405.05.

### f.    Additional Local Shop Over-Billing

As demonstrated at trial, there were approximately 30-35 popular pairings of parts that were routinely voided and re-billed by the corporate office that resulted in over-billings to insurance companies.  Based upon testimony at trial and a recovered e-mail from the defendant's

UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR REMAND
CASE NO. CR 09-00021 DLJ         7

own computer, it is reasonable to conclude that these fraudulent interchanges were also occurring at the local shops.  Testimony at trial demonstrated that many local shop employees were instructed to bill for the higher-priced part when one was available on the Dialmark system but actually to install a lower-priced part.  Listed below are a sampling of four of these popular part substitutions and their potential financial impact on the loss amount:

### 1.     DW1432 ➔ DW1293

In a February 14, 2003 e-mail from Huntsville, Alabama Glass Pro shop manager Carmel O'Steen to the defendant, O'Steen informed the defendant that part numbers DW1432 and DW1293 were interchangeable for billing purposes and suggested that the company could bill for the more expensive DW1293 yet purchase and install the less-expensive DW1432.  (See Trial Exhibit 1103.)  O'Steen also suggested passing along this information to other employees through Regional Manager Neal Schreiner.  Trial testimony from Joseph Leonti established that a visual inspection of a local vehicle during trial revealed that a DW1432 windshield had, in fact, been installed and the customer's insurance company was billed for a DW1293.

A review of the Dialmark billing data reveals that between November 1, 2002 and December 15, 2006, 574 DW1293s were invoiced at the local shops and ultimately billed to insurance companies.  Based upon an average price difference of $395.72, the total price difference for this part substitution alone is $227,143.28.

### 2.     DW1288 ➔ DW1289

Another analysis of the Dialmark billing data reveals that between November 1, 2002 and December 15, 2006, 448 DW1289s were invoiced at the local shops and ultimately billed to insurance companies.  Based upon an average price difference of $197.68, the total price difference for this part substitution is $88,560.64.

### 3.     FW2230 ➔ FW2231

A separate analysis of the Dialmark billing data reveals that between November 14, 2002 and December 18, 2006, 85 FW2231s were invoiced at the local shops and ultimately billed to insurance companies.  Based upon an average price difference of $502.44, the total price difference for this part substitution is $42,707.40.

UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR REMAND
CASE NO. CR 09-00021 DLJ                    8

1

### 4.      DW1474 ➤ DW1509

2

Yet another analysis of the Dialmark billing data reveals that between April 23, 2003 and

3

June 28, 2006, 92 DW1509s were invoiced at the local shops and ultimately billed to insurance

4

companies.  Based upon an average price difference of $365.84, the total price difference is

5

$33,657.28.

6

### g.      High Modulus Urethane Over-Billings

7

At trial, several witnesses, including Regional Manager Neal Schriener, who supervised

8

up to 39 local shops, and District Manager Mary Pitts who supervised approximately seven

9

shops, testified that their shops never used high modulus urethane, an expensive adhesive

10

designed for high-end European windshield installations.  Moreover, Jodie Lim, the Oakland

11

shop manager, testified that he never used high modulus urethane during the 9 years he managed

12

the Oakland Glass Pro shop.  These individuals and several other witnesses testified that they

13

always used standard urethane.  Despite this testimony, an analysis of the Dialmark billing data

14

reveals that between November 1, 2002 and December 18, 2006, HMU was billed to insurance

15

companies 9,170 times for a total of $298,065.25.

16

### h.      Installation Molding Over-Billing

17

At trial, several witnesses testified that they were instructed to re-use moldings whenever

18

possible but to always bill for moldings on each insurance job.  It is unclear how often this

19

happened and witnesses stated that it largely depended on the skill level of the glass technician.

20

At trial,  Jodie Lim, manager of the Oakland Glass Pro shop, estimated that his shop re-used

21

molding 30% of the time, but always billed for moldings.  What is clear is that in each shop,

22

technicians were encouraged, and indeed instructed employees, to try and salvage the existing

23

molding on a vehicle yet bill for new molding on each insurance job.

24

A review of the Dialmark data reveals that between November 1, 2002 and December 18,

25

2006, installation molding was billed to insurance companies 73,427 times for a total of

26

$2,331,693.40.  As such, the following estimated over-billings can be made using various re-use

27

frequency rates:

28

UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR REMAND
CASE NO. CR 09-00021 DLJ             9

10% reused = $233,169.34

25% reused = $582,923.35 (Mid-range)

40% reused = $932,677.36

Therefore, taking the mid-range, which assumes that moldings were re-used on only 1/4 of the insurance jobs, the loss amount is $582,923.35.

### i.    Loss Amount Summary Chart

A compilation of each of the above-referenced loss categories results in the following summary chart:

| TYPE | AMOUNT |
|---|---|
| 1999 - 2002 Over-billings | Unknown |
| Ford Oval Bands (FOBs) | $370,257.51 |
| Heads Up Display (HUDs) | $286,687.30 |
| Attachment Corporate Voids/Re-Bills | $39,482.71 |
| Additional Corporate Voids/Re-Bills | $243,405.05 |
| Local Shop Substitution: DW1293 | $227,143.28 |
| Local Shop Substitution:  DW1289 | $88,560.64 |
| Local Shop Substitution:  FW2231 | $42,707.40 |
| Local Shop Substitution:  DW1509 | $33,657.28 |
| Additional Local Shop Over-billings | Unknown |
| High Modulus Urethane | $198,065.25 |
| Moldings | $582,923.35 (mid-range) |
| **TOTAL** | **$2,112,889.77** |

### 2.    More than 50 victims

It is clear from pre-trial interviews and the trial testimony of Aldy Antonio that Glass Emporium did not discriminate when it came to defrauding insurance companies.  No effort was made to limit the fraud to certain insurance companies.  An analysis of the Dialmark billing data revealed that for the 950 confirmed fraudulent DW1332 and DW1335 claims, 58 different

UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR REMAND
CASE NO. CR 09-00021 DLJ            10

insurance companies were victimized. A further analysis of the data revealed that of the 3,700 voided and re-billed invoices by the corporate office, 77 different insurance companies were victimized.  This would include the aforementioned 58 insurance companies which were over-billed for a DW1332 or DW1335.  Thus, the evidence establishes that 77 insurance companies were victimized by the defendant's scheme to defraud.

### 3.    Role in the Offense

The defendant testified that he is the sole owner of Glass Emporium of Marin and paid himself a salary of $2.6 million plus a bonus in 2006, and during the past two years his salary has increased to approximately $4 or $5 million per year.  During trial, no less than eight employees testified that Hakimian had personally directed them to commit fraud.  These witnesses included former employees, present employees, and employees at all levels, including regional managers, district managers, field store managers, and employees at the corporate office.  Several other witnesses testified that they were instructed to commit fraud by other employees, who explained that their directive came from the defendant.  Given the extent of the fraud that occurred over a period of several years, all at the direction of the owner of the company, a four-level enhancement pursuant to U.S.S.G .§ 3B1.1(a) is appropriate.

### 4.    Obstruction of Justice

The defendant was convicted of the violation of 18 U.S.C. § 1952, Obstruction of Justice, charged in Count Thirteen.  This charge relates to the destruction and concealment of records that had been kept at the corporate office.  Beyond the conviction of obstruction of justice offense, the defendant further obstructed justice by committing perjury when testifying at trial, denying any responsibility for the fraud committed on insurance companies on behalf of his company Glass Emporium.   In accordance with U.S.S.G. §3C1.1, the USPO correctly increased the guidelines range of the wire fraud calculations by two levels for obstruction of justice.  (Amended PSR at ¶50).

As for the specific obstruction of justice charge, the defendant testified that he did not intend to obstruct justice by ordering the removal of 20,000 pounds of documents from the corporate warehouse approximately five weeks after the December 19, 2006 search of the corporate office and disposing of these boxes at a recycling center down the street from his

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

office.  The defendant testified that this move was made in the ordinary course of business and necessary to make room for other records.   However, employees testified that they had no advance notice of the move of the records until one day in late January 2007 when they were told to assist in the removal of most all the boxes stored in the second story of the corporate office. One witness asked the Vice-President, Emma DeGuzman, why they were moving the boxes of records and DeGuzman told her to just continue to assist and not to ask any other questions. Moreover, no witness could recall any time prior to the December 2006 search when such a large number of boxes were removed from the corporate office.

   At trial, FBI Special Agent William Leoni testified that during the search of the corporate office on December 19, 2006, he handed the defendant a copy of the search warrant authorizing the search and a listing of the items to be seized, which included records from 2001 to the present. (<u>See</u> Trial Exhibit 310).  Agent Leoni further testified that before leaving the search site, he informed the defendant that although the warrant authorized the search and seizure of many more boxes of documents stored at the corporate office than the year 2005, which were seized, that it would "behoove" the defendant to maintain the remaining boxes of documents at the corporate office.  Agent Leoni testified that through his response the defendant acknowledged understanding this directive and indicated to Agent Leoni that the defendant would maintain the records.

   Agent Leoni testified that he learned of the removal of the boxes from the corporate office within days after the event in January 2007, when employee Tracy Lay called Agent Leoni and advised him that the defendant had directed the removal of the boxes of records.   Agent Leoni located the recycling center and discovered that 20,000 pounds of documents from Glass Emporium had been sold to the recycling center for several hundred dollars.  Agent Leoni discovered that the recycling center had removed the records from the boxes and bound them tightly together in 1,500 pound bales, making a close review of the records exceedingly difficult. Nevertheless, the FBI rented a flatbed truck and transported the 20,000 pounds of documents to a

UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR REMAND
CASE NO. CR 09-00021 DLJ                    12

warehouse where they remain.  Agent Leoni pulled some of the documents loose from one bale and upon review of these records, learned that they were records that the FBI had been authorized to seize pursuant to the search warrant and relevant to the fraud investigation.

The defense presented evidence that hundreds more boxes of documents were removed around the same time that the approximately 1000 boxes were disposed of at the recycling center. These other boxes were initially transported and stored at the defendant's brother-in-law's warehouse in Alameda.  Later, the records were moved to a storage room at the Santa Rosa field store, and when that store closed in 2008, a warehouse in Alameda was rented and the boxes of records were moved to this Alameda warehouse.  A former store manager at the Santa Rosa store testified that a person came one day and told him he was from the FBI, although the man produced no identifying credential or badge and asked to look around.  When the manager denied the man's request, he left.  The witness testified that the person who had identified himself was not case agent Leoni seated at the government table.  Agent Leoni later testified that he never went to the Santa Rosa store, never directed anyone to go there, and would have been the only person from the FBI who would have directed others to go to the Santa Rosa store in relationship to this case.  More importantly, Agent Leoni testified that he had no knowledge that other boxes had been removed from the corporate beside those brought to the recycling center until just days before trial when defense counsel informed the government of the existence of the other records.

Ms. Bonny Anderson testified that in 2008, when she returned as the manager of the Santa Rosa store, the records had already been brought to the store and stored in a back room. She testified that the defendant called her one day and informed her that no one was to gain access to the back room where the records were stored without a search warrant.

In summary, the defendant obstructed justice by concealing those invoices and auto glass vendor receipts sent to the corporate office from the field stores that would not support the insurance invoices voided at the corporate office and re-billed at higher rates for more expensive parts not installed and used.

UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR REMAND
CASE NO. CR 09-00021 DLJ          13

### 5.    No Acceptance of Responsibility

A decrease in an offense level is appropriate where a defendant clearly demonstrates acceptance of responsibility for his offense. U.S.S.G. § 3E1.1(b). This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. U.S.S.G. § 3E1.1, Application n. 2. The Court may consider whether the defendant truthfully admitted the conduct comprising the offenses of conviction as well as any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct). U.S.S.G. § 3E1.1, Application n.1(a).

Here, the defendant pleaded guilty to the visa fraud offenses and the two harboring illegal alien offenses and denied under oath any involvement in the other charged offenses he contested at trial. Any credit for acceptance of responsibility thus is limited to the Guidelines calculations for these offenses. For all other offenses, the defendant put the government to its burden of proof at trial and testified that he had not committed the charged obstruction of justice and wire fraud offenses. For both of these reasons, he is ineligible for a reduction based on acceptance of responsibility.

### C.    18 U.S.C. § 3553 factors

The factors set forth in 18 U.S.C. §3553(a) support the USPO's and the government's recommended sentence of 135 months. This case involves a highly compensated owner of a automobile glass replacement company charged and convicted of a multitude of crimes, including visa fraud, harboring illegal aliens, wire fraud, and obstruction offenses. The nature and circumstances of the case firmly support the conclusion that a sentence of 135 months is reasonable.

### 1.    Nature and Circumstances of the Offenses

Pursuant to 18 U.S.C. § 3553(a)(1), the Court should consider "the nature and circumstances of the offense" in rendering the sentence. The defendant began his insurance fraud

UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR REMAND
CASE NO. CR 09-00021 DLJ                    14

scheme in 1999 and continued it through 2006.  The defendant alone initiated the scheme and alone profited from the scheme.  Unfortunately, he involved many of his employees in his criminal conduct, including his three co-defendants, none of whom had previously suffered a criminal conviction, but by following the orders of the defendant, without any additional compensation, became involved in the crimes and now face the consequences.  The defendant's criminal conduct was wide-spread, involving many employees, 77 insurance companies, over a span of several years.  The crime went undetected in part because many of those involved had little choice but to follow the defendant's orders since their employment and ability to remain in the United states was dependent upon pleasing the defendant.

The wire fraud offenses are only a part of the defendant's criminal conduct.   The defendant furthered the insurance fraud through the hiring of illegal aliens who because of their background, were not eligible for H1B visas, and who hired many others who had the appropriate education and experience to qualify for an H1B visa, had their sponsor correctly identified the position to be filled as one that qualified for an B1B visa, and who was willing to pay the foreign workers salaries commensurate with that position in that geographical area.  By falsifying the H1B visa applications, the defendant was able to employ well-educated, foreign workers from the Philippines willing to work in clerical positions for low wages, in exchange for the opportunity to work and live in the United States.

The defendant took special care of two foreign workers who were most involved in the wire fraud.  For Aldy Antonio, once an employee was fired and threatened to disclose to immigration defendant's practice of employing illegal aliens, the defendant directed Antonio, an undocumented worker from the Phillippines, and his wife, a Filipino national unauthorized to work, to work at home to avoid detection by the immigration service.  During the time they worked at home, defendant paid them in cash or from checks written to a business set up to avoid records of payments made by Glass Emporium.  Thereafter, even after Antonio left the company, the defendant continued paying him for several months.

UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR REMAND
CASE NO. CR 09-00021 DLJ                    15

For Bobby Guinto, the defendant sponsored him for an H1B visa, allowing Guinto to receive a special work visa although he lacked the proper education, was not hired to fill an authorized position, and was not paid the required salary. After Guinto's visa was approved, he brought his wife Nannette Guinto to the United States from the Phillippines.  Mrs. Guinto was in the United States on a H-4 visa, which did not authorize her to work.  Nevertheless, the defendant hired Ms. Guinto and instead of placing her on the Glass Emporium payroll, he combined her salary with that of her husband's salary, thereby increasing the pay to Guinto and creating no record of payments to Mrs. Guinto.   To further prevent the detection of Mrs. Guinto's illegal employment, defendant had Mrs. Guinto sign a document falsely representing that she was an unpaid intern, a fact to which Mrs. Guinto testified at trial.  Moreover, long after Guinto had pled guilty to wire fraud, the defendant continued his employment and in fact, just before trial, after Guinto had been identified as a witness for the government, the defendant more than doubled his salary.

### 2.  Respect for the Law

Pursuant to 18 U.S.C. § 3553(2)(A), the Court should also evaluate the defendant's sentence in terms of how it "promote[s] respect for the law."   The defendant has established through a pattern of criminal conduct that he has little regard for the law.  Prior to establishing the business called Glass Emporium of Marin, the defendant owned a business called TAGS that replaced auto glass.  There were three TAGS locations, San Francisco, Oakland, and North Highlands.  In 1995, the State of California Department of Consumer Affairs, Bureau of Automotive Repair, filed an accusation encompassing a number of fraudulent acts, including the over-billing of insurance companies.  As a result, Hakimian signed a settlement agreement which did not require him to admit guilt, but required that he not contest the loss of his business licenses.

The defendant agreed not to contest the loss of his license because of the detailed investigation that uncovered numerous violations, including fraud on insurance companies.

UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR REMAND
CASE NO. CR 09-00021 DLJ              16

Although at trial the defendant denied this fraud allegation, the investigation makes clear that the defendant while the owner of TAGS Autoglass, knowingly and intentionally overcharged insurance companies. After agreeing not to contest the loss of his business license in 1996, three years later, under a new business license, the defendant once again directs his employees to defraud insurance companies. Here, he furthers the fraud by lying under oath on visa applications submitted to federal agencies. Beside submitting fraudulent visa applications, he also employs illegal aliens and conceals them from immigration authorities when threatened with exposure. Moreover, the defendant obstructs justice in two ways. He attempted to avoid detection of his involvement in the fraud conspiracy by concealing and destroying records relevant to the crimes. Additionally, at trial, the defendant committed perjury when denying any involvement in the charged offenses. A sentence of 135 months is necessary and appropriate given the seriousness of offense, to promote respect for the law, and to provide just punishment.

### 3. Deterrence

As discussed above, the defendant was undeterred by the earlier investigation resulting in the loss of his business license. Moreover, the defendant testified at trial and denied any involvement in the wire fraud, denied intending to obstruct justice, denied knowing from the beginning that the visa fraud applications he signed were false in any respect, denied that he illegally hired aliens for his own benefit, and denied any involvement in the earlier fraud offenses committed while he was the owner of TAGS Auto Glass, for which he lost his business license.

Every admission made by the defendant came with an explanation. For example, the defendant admitted that he committed visa fraud, but only after he had signed visa applications for three aliens without knowing that Job Link, which filled out the applications, had falsified information material to the approval of the applications. Although he later learned that the visa applications contained false information, the defendant testified it was Job Link that filled out the applications that contained the false information, with no input from him; he only signed them. The defendant admitted he knew it was wrong to submit the twenty visa applications that

UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR REMAND
CASE NO. CR 09-00021 DLJ                    17

contained false information to the federal agencies under the penalty of perjury, and informed the jury that he was sorry, but claims he only did so because as a foreigner, he had a close connection with these aliens and wanted to give them an opportunity to work and live in the United States. In fact, the defendant was the only one who stood to financially gain by these crimes. As for the false visa applications, the defendant got a captive workforce at cheap labor rates who had no choice but to follow his orders. As to the wire fraud, defendant received the financial benefit from the fraud. No other employee made a salary close to defendant's millions each year. In sum, the defendant has presented little evidence that the convictions alone will deter him from future criminal conduct.

Trial witnesses testified that overbillings by auto glass companies on insurance companies was not limited to the defendant's company. As the owner of a successful glass company with 70 stores located throughout the country, this prosecution is expected to receive much attention, particularly in the auto glass industry. A sentence commensurate with the seriousness of the crime will put others on notice that those that commit fraud face significant penalties.

III.   **GOVERNMENT'S RECOMMENDATION**

The government does not believe that there is any legitimate basis for a sentence below the applicable guidelines range. In fact, although the defendant has no prior criminal history and thus no criminal history points, as discussed above, this is not the first time he has committed fraud. Moreover, the defendant's wire fraud, visa fraud, and harboring illegal aliens convictions are exacerbated by the conviction for obstruction of justice, and the defendant's testimony denying any involved in the charged offenses contested at trial.

Even in sentencing, in his letter to the Court, the defendant minimizes his role, contending that Joblink was the prime cause of the false visa applications, that the defendant's involvement in the visa fraud was based upon a desire to aid the foreign workers, that once aware of overbillings to insurance companies he would have immediately repaid the insurance

UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR REMAND
CASE NO. CR 09-00021 DLJ                    18

companies but waited until just prior to trial when authorized to do so by his attorneys.   The

defendant's excuses do not square with the evidence establishing the defendant's true motive:

greed.

Based upon the applicable guidelines and the § 3553 factors discussed above, a sentence

of 135 months imprisonment is appropriate.  Given the difficulty in parsing out specific loss

amounts to individual insurance companies, the earlier settlement with State Farm Insurance, the

company that conducted the most significant investigation, the repayment to Alfa Insurance, the

only other insurance company beside State Farm that conducted its own investigation, and the

recent payments made by the defendant to numerous insurance companies,[2] the government is

not requesting an order of restitution pursuant to U.S.S.G. §5E1.1. In lieu of restitution, the

government recommends a fine of $175,000, which is the high end of the applicable guideline

range.  Such a fine is appropriate given the defendant's financial status and gains received both

from employment of foreign workers paid minimal wages, and the illegal profits derived from

the fraudulent scheme.  Any lower fine amount would not be sufficient to ensure that the fine,

taken together with other sanctions imposed, is punitive.  U.S.S.G.. § 5E1.2(d)(1).  The

government further recommends a term of supervised release of three years following the period

of incarceration.

## IV.   MOTION FOR REMAND

The government moves for the defendant's remand at sentencing pursuant to 18 U.S.C. §

3143(b).  A sentenced defendant must be detained unless the judicial officer finds by clear and

convincing evidence that the defendant is not likely to flea or pose a danger if released, and that

if an appeal is filed, that the appeal is not for purposes of delay and raises substantial question of

law and fact likely to result in reversal, an order for a new trial, a sentence that does not include a

---

[2] The government does not agree that: 1) these repayments encompass the full loss
amounts to the insurance companies resulting from the wire fraud scheme; or 2) these payments
serve as a decrease to the applicable loss amount.

UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR REMAND
CASE NO. CR 09-00021 DLJ                19

term of imprisonment, or a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process. 18 U.S.C. § 3143(b)(A) and (B)(i)(ii)(iii) and (iv).

The defendant has identified no issues in his motion for a new trial that are likely to result in reversal or an order for a new trial.  Moreover, given the number of convictions, the applicable guideline range of 135-168 months, the seriousness of the convictions, including the large number of victims, the fact that the crimes occurred over years, the role the defendant played in the crimes, and other aggravating factors, the government fully expects that the defendant will be sentenced to a lengthy term of imprisonment.  Even if the defendant raised a substantial issue that may result in a reversal, this would likely only impact the charges upon which he was tried, and would not impact the convictions for nine visa fraud charges and two illegal harboring charges to which the defendant plead guilty.  These convictions by themselves result in an offense level 21 and a Guidelines range of 37-46 months.  (Amended PSR at ¶ 67; U.S.S.G. Sentencing Table).  Thus, a sentence on these convictions alone would be greater than the expected duration of the appeal process.  For these reasons, the government respectfully requests that the defendant be remanded.

DATED: June 29, 2010                          Respectfully submitted,

                                              Joseph P. Russoniello
                                              United States Attorney


                                  By:         _____/s/_____
                                              STEPHEN G. CORRIGAN
                                              WADE M. RHYNE
                                              Assistant United States Attorneys

UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR REMAND
CASE NO. CR 09-00021 DLJ                       20